The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. Good morning, counsel. This is case number 4-24-0083, In Re, the Marriage of Ann Folley and Gregory Folley. I'm not sure if I'm pronouncing the last name correctly. First, we'd like to have appearances for the appellate. Julie Galassi. Thank you. And for the appellate? Good morning, Your Honor. Michael D. Domenico for the appellate.  Thank you. Ms. Galassi, you may proceed with your argument. Thank you. May it please the court and counsel, my argument is short and hopefully simple. We take the position that no reasonable person would take the view of the trial court that $14,000 per month in maintenance is appropriate when the award grants one party 80% of the party's total income in an amount that far exceeds the party's needs, even if you consider saving income as part of the standard of living of the marriage. The third district appellate court noted that the analysis rested on Ann's need for maintenance and Greg's ability to pay. In order to determine what some amount of maintenance was appropriate, the trial court was required, first, to consider Ann's needs and, second, Greg's ability to pay. If we first look at her needs, first, I would note that if the court reviews all of the pleadings in this case, including the marital settlement agreement, at no time has my client diminished his former wife's significant role in raising nine children. Likewise, I don't believe there's any doubt that he worked extremely hard to support a family of 10 and accumulate significant assets. I will say, though, Ms. Galassi, that a lot of your argument is really hyper-focused on income, and that certainly could lead us to overlooking those other factors, which we know that income is just one. Why is your approach so hyper-focused on income? I don't think it's hyper-focused. I think the two factors are intertwined, and I've tried to narrow in on both of those. I agree that there's not a significant record on the standard of living of the parties while they were married, other than both parties now live a better life than they did while they were married, and that they were able to, you know, fund nine children's 520-noughton accounts and lived a comfortable life from that. We don't know much more, other than they had two houses with, I think, less than $200,000 in equity, which is different. So I don't think I'm necessarily focused primarily on income. It is just that the trial court's award of some amount so far obliterates my client's disposable income and more or less forces him, so long as this maintenance is in place, to continually liquidate his assets in order to pay a maintenance award that far exceeds Anne Folley's needs. I have a question for you. Didn't the appellate court in the previous appeal conclude that your client should liquidate a portion of his assets, that that was an appropriate thing for the trial court to require? Yes, and we're not claiming zero. Well, you seem to be arguing, however, that that he should not be required to liquidate his assets, and you cite your brief, despite what the appellate court said in its prior decision. And maybe I did not express it artfully enough. It is just that I am looking at the impact of having to reach in and pay those assets and how it would factor into considering her needs. Well, page 15 of your brief says, therefore, the obligor should not be required to liquidate his assets when the obligee is financial independence and no foreseeable emergency. So you're arguing against any liquidation of assets? I'm not arguing against, and I think that my prayer for relief goes basically into an income split of the pensions. It is simply I am noting that if I were to look at this case, as far as her needs, I don't think that they call for $14,000, and it's kind of zeroing in on what is the impact of both of these awards. And maybe I lost the tail end of your question there. Your claim is he should not be required to liquidate his assets because the obligee has financial independence and no foreseeable emergency. Isn't that contrary to what the third district said in the prior appeal? It is contrary, but what we have proposed, and I'll call it the Goldilocks choice, of what we were presented with is zero is not enough, 20,000 is too much. What is that sum amount? What is the magic amount to award given the appellate court's ruling? And it seems to me that the most equitable way in light of income and needs is that you treat these people as they treated themselves in the marital settlement agreement, and that was by dividing everything. They shared the children's expenses. They split every asset equally, and so it seems to me to achieve that sum amount, it would be appropriate to take the total pensions, put them together, and make it so that they each receive a respective 50% of the pensions. Isn't your math here telling me that you think she had over 60% of the income under the original MSA provisions, and that she now has nearly 80%? So, by your math, he's getting less than he got before. No, no, that's not what we have put forth. The original agreement where she received her maintenance and then you considered her investment income, his CAT income and his investment income, she was receiving a roughly 29% to 29% or 30% of the total share of the income. So, that was the snapshot picture before his forced retirement, and then I just kind of tracked along, okay, what happened when he was forced into retirement, what was the situation at that time? And at that time, she was then receiving, and as well as him, their shares of the Caterpillar pension, which then upped. If you kept the 20,000 maintenance in place, her total share of the income went from 30% to 63%. But that's a percentage that you figure by double counting the 20,000. You see on your column with the after, meaning the following the $14,000 adjustment, you do take out his maintenance obligation, but in the old calculation, meaning what you're calculating after the first remand, you're double counting that 20,000. I don't see how you come up with that because essentially if she's getting 14,000 in maintenance, roughly 11 in a pension, and my post remand income simply shows that 14,000 being paid out of his pension income. When we look at the two together, there is no $20,000 asset. There is no plus. It's a minus to one and a plus to others. So it doesn't affect the party's total income. If you actually count it as both income to her and then don't count it as reduction to him, you're inflating the income amounts. I don't see your point, and I don't see where you're getting into the double counting. If you agree the methodology when we compare what it was before the trial court's action and what it was after the trial court's action, we should use the same methodology to make those comparisons make sense. Correct. Okay. But the post remand income is no longer $20,000 in maintenance. It's 14,000. Correct. But we would be making the same formula whether it was post retirement or post remand. I don't know if that's necessarily true because I think that because you have to consider both needs and income, you still have to consider that now as opposed to the pre-retirement, she's receiving an additional $11,000 in income, just like he's receiving. If I wasn't clear, I was talking about the calculation of shares of income. We should use the same formula and change any amounts that have changed. Correct. Just going back to- Counsel, you suggested how the trial court could have responded in this case and using the phrase, the Goldilocks approach, thought would be an appropriate one. And assuming for the moment, you're correct. The question for us, however, is not, is that the best approach for the one we might have taken? But the question is whether or not the trial court abused its discretion in taking that approach, which means that we would have to conclude that no reasonable person on the circumstances and evidence and arguments before the trial court would have taken that approach and reached this conclusion. How on this record can we do that? I think you can do it for two reasons. The first being that it isn't, well, I would have liked to have done it this way. Gee whiz, I wish she would have decided otherwise. It is that I don't think any reasonable person could conclude at the end of the day that it is appropriate for, you know, the length of this order that Ann Folley never has to worry about any type of invasion of her nest egg for any source whatsoever because of the income that she is receiving, which is more than what she was receiving at the time of divorce. And at the same time, you know, basically stripping away either the majority of his pension, depending upon how he would choose to pay any award, whether it's by, you know, liquidating assets each month or turning over $14,000 of his pension, thereby reducing his total income. In saying that she's making more than she's making at the time of divorce, is that because you're adding in the pension? Yes. Yes, which I feel is appropriate because, you know, you consider the needs and the income of the parties. The, you know, I wish that he was still receiving $66,000 a month in income and we wouldn't be here, but the fact is that his income has stopped, his severance pay has stopped, and his income, it comes from his pension and his investment income, as does hers. So what I'm saying is that the court, no reasonable person would take the approach that one party gets to accumulate assets with funds that were well beyond her needs, while the other party must liquidate their assets to do so. I think that is somewhat of a revision of the marital settlement agreement. You're the party, though, asking us that we not be bound by the marital settlement agreement, that we change it, right? That it doesn't apply anymore, the circumstances have changed. What's the rationale for continuing to adhere to a situation the parties didn't bargain for? Well, certainly there's nothing in the marital settlement agreement that says it's not modifiable in the future. Certainly his retirement, I believe, would have been a substantial change in circumstance. No, did they contemplate that he would be forced into a retirement? No, they did not. I can only look to the document itself and how they treated each other financially in dividing up the assets and settling upon this $20,000 figure of unallocated support, you know, to support Anne and the two children that were in her care. And they divided all of those expenses equally. So, it is that theme that I rely upon, even though there is no specific provision that, well, if Greg is forced out of Caterpillar, here's what we're going to do. Right. So, this is a circumstance the agreement doesn't address, and so the court looks first to the statutory factors. Correct. And while the court may consider the MSA, it's no longer the guiding document here, is it? I don't believe so, and I have struggled to come up with what is some amount that is appropriate, and that is, you know, my prayer for relief about splitting the That is the, quote, some amount that I think strikes the balance of providing some maintenance that can be paid out of his income and in a way that more closely aligns with the party's original intent and then satisfies the 504 factors. He also continues to have earning potential, and much greater than she does. Is that fair? That is fair. That is fair, and it was, I believe, Judge Kelly, the original trial judge, who ordered my client to make a job search, provide those results to Ann's counsel. That is not part of the order now, and I think it's probably a recognition that, you know, he's hit 65. I know under Caterpillar, he would have been required to retire anyway. But in any event, his job search from when the appeal started in, what, 2018, to when it was remanded back by the appellate court over two years, you know, he hadn't found anything, you know, to tap into his skill set. And obviously, you know, there is not any indication in the file that he was underemploying or, you know, not doing what Judge Kelly ordered him to do in the job search. But, you know, frankly, I admit he has a greater potential to earn income, but he is at that 65 age mark, and there aren't, I'm sorry, this is my opinion, you know, the market for high-end, high-earning VPs who make over a million bucks a year, you know, it's pretty small. And, you know, you are correct that I go into the math, and that is just because, you know, what I looked at, what is the effect of all this? And in a normal situation, I would have taken the position that, you know, Judge Kelly was not, I'm sorry? I think that's just your time expected. Oh, okay. In any event, our prayer for relief calls for equalizing the pensions, and absent any other questions, that concludes my argument. All right. Thank you, Mr. Pelosi. Mr. DiDomenico, you may proceed with your argument. Justice Harrison, may it please the Court? Again, Michael DiDomenico for Ann Folley. I'll pick up like most appellees in domestic relations appeals with the standard of review. As Justice Steigman said, we're at abuse of discretion. The Court has to find no reasonable person would receive the Folley 1 remand that said the answer in this case is not zero, and it's not $20,000, and to reexamine the factors in light of Mr. Folley's now $12 million in assets, notwithstanding his forced retirement from Caterpillar. I thought it was curious that counsel is seemingly making some type of argument to effectuate the intent of the marital settlement agreement, which Justice Dougherty pointed out, trying to change it at the same time. They're trying to change the number that they don't like, but somehow enforce the rest in some regard, which I thought is interesting because at the time of the divorce, what their intention was, was they had equal assets, right? They cut up equally $5 million. Just five years later, we have a $4.5 million disparity in assets, $12 million on Mr. Folley's side, $7.5 on my client's side. After a 30-year marriage and nine children, the maintenance that was ordered by the Third District here in some amount was intended to make that disparity of assets fair and equitable after this length of marriage. What about the suggestion that his assets are larger because they've been husbanded more carefully, that he's grown them and not consumed them, so he's done more than his ex-wife has done? First of all, he was making about $1 million, too, at the time of the divorce. By the time the 5-10 modification trial started, it was over $2 million. His increase in income and assets is attributable to his work at Caterpillar, but he would never have been in the position to make that money post-divorce in that five years after the 2012 dissolution, but for this marriage and for Ms. Folley's house and homemaker contribution in giving birth nine times and raising nine children at home so he could go off and go to work every day. But the notion that he saved assets and invested them, that was part of the marital lifestyle, as Folley 1 found, that that saving and investing was part of this marital lifestyle to the extent that there was evidence of lifestyle in this record. Folley 1 noted there wasn't detailed evidence about what the marital lifestyle was like because there was a marital settlement agreement here. But the notion that, and again, just to your point about counsel's hyper-focus on income, I think that that's extraordinarily well taken because that's all Ms. Glossy's were focused on this morning and in the brief. She's just talking about let's look at the income as it stands now, and let's just forget about that huge asset disparity, when that was the very reason Folley 1 vacated this decision. And more than that, when you have this kind of asset disparity this quickly after the dissolution judgment, this is one of the reasons why the statute says that maintenance can be paid from the income or property of the other spouse as justice requires. That's right from Section 504A of the Illinois Marriage and Dissolution of Marriage Act. And the common law has put an exclamation point on the property part in permanent, now indefinite maintenance cases. And yes, if you're strictly looking at income, what the incomes are to the exclusion of the assets, yeah, she may end up receiving a greater than 50% share of the income, but he has $12 million in assets. And one of the things that Folley 1 noted, and it's certainly not addressed by my opponent in her brief, Liquidity had $5 million in Caterpillar options that he cashed in to pay cash for a $3.3 million condo for him and his new wife down in Florida, various discretionary spending, gifts to his, generalized donations, money to his children. They noted there were some expenses that he clearly could have cut. A cynic would say that he parked large portions of cash into real estate to diminish his income, right? So he couldn't put all that cash to work and generate income. But the court considered that. The court considered everything that Ms. Galassi is arguing this morning and argued in her brief. The court was charged to re-exercise its discretion in light of the fact that the first judge effectively lost sight of the fact that there is this huge disparity in assets. And in a permanent maintenance case, the permanent maintenance payors are going to be charged to look to their assets to pay. Yes, if he has to liquidate, he has to liquidate. Why is that okay? Because the statute says it's okay. Because the common law says it's okay. Counsel had the point about, strike that. The other thing I wanted to mention is that, you know, the court found that the maintenance guidelines didn't apply. You know, the court did, which was accurate, which isn't challenged to the court. But the court nevertheless made a finding that even if she were to apply the guidelines, it came out to about $3,000 a month. And I think the court was sort of, you know, pointing out that in no world would somebody with $12 million in assets after this length of marriage and this disparity in assets should be charged to pay $3,000 a month gross. That's the other fallacy of the numbers and the charts in the briefing. Besides what your honor pointed out, they don't even account for the fact that this is tax deductible maintenance. It's not $14,000. This is an old judgment that predates the tax code. It's an above the line deduction. He's paying less than $10,000 net. Even if you look at what he gives away to his donations and his children, it's almost close to that amount. And to suggest that the circuit court judge abused her discretion by ordering that amount based upon his income, his assets, and his ability to earn income and what she gave up for this marriage. It seems a near impossible conclusion for the three of you to reach to say that she committed reversible error here. In my view, she should be commended and not reversed. I don't have anything else to add unless your honors have any questions. I don't see any other questions. Thank you. Ms. Galassi, rebuttal argument. Thank you. A couple of points and that is, you know, if you listen to what counsel is saying that the appellate court took into account the assets he accumulated after the marriage and that she was partly responsible for his ability to do so. He's essentially arguing that there should be now a reallocation of those non-marital assets since now he has more than she does. May I ask just to put a little perspective on what we're talking about here. You agree it's about $12 million for his assets? Correct. And the $14,000 a month works out to about $168,000 a year? Correct. So that's about every year one and a half percent of his assets, which he's chosen not to put in income generating vehicles. Regardless, one and a half percent of his assets per year would equal what he's being asked to pay. I think my point is that you can look at these big numbers and these are numbers that I don't see much in my family cases, but how he chose to spend one, his non-marital assets, which counsel alluded to, occurred before the forced retirement. And two, I believe that it is a bad precedent to say that even if it's one and a half percent, if it results in a total windfall to the party who has minimal or no needs is inappropriate and no person would take that view. The other point is that, you know, she is not, quote, entitled to a reallocation of his non-marital assets after the divorce. Certainly, he's got the ability to pay, but again, it is what is some and what is too much and what is too little. And it's something that I have wrestled with, but I don't believe that a reallocation of 12 million down to seven so that they are equal is appropriate. Do you see the tension of your client taking his assets and investing them in a non-income generating way and for then you to argue with a focus on income to make the allocation decision? I went by what was in the record and there wasn't a whole lot, I mean, other than, you know, the consideration of the financial affidavits of the parties. I don't believe that there was extensive testimony about how each party chose to invest their share of the marital estate. But we know he's got 12 million in assets and it's generating something less than, I guess it's about $7,500 a year. I'm sorry, a month. That is correct, but I would ask you to remember that at the time of that financial affidavit, he was spending a lot of money. He had a lavish lifestyle before he was forced into retirement. We don't have a snapshot of what occurred, you know, after the money ran out. But they both had that lifestyle. Yeah, I mean, you know, she was able to, you know, buy a $700,000 house for cash. So we don't, you know, you don't have, I don't have a snapshot of what he changed, if anything, after the money ran out. We only know that there was a hearing once all those severance payments ran out. And by then the financial affidavit showed all of these expenses, his $3 million condo, et cetera, et cetera. So that, you know, you have to keep in mind that what he was doing then doesn't necessarily mean that's what he was doing the day after, you know, the hearing on the petition to modify. All right, Ms. Pelosi, you are out of time. Okay. Thank you so much, Your Honor and counsel. All right. Thank you. Thank you both for your arguments. The case will be taken under advisement and the court will issue a written decision. The court stands in recess.